Honorable Judge Benjamin H. Settle
Honorable David W. Christel

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

JESUS CHAVEZ FLORES,

                            Plaintiff,

            v.

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT, *et al.*,

                            Defendants.

NO.  3:18-cv-05139-BSH-DWC

**SECOND AMENDED COMPLAINT**

**JURY DEMAND**

## I.      <u>INTRODUCTION</u>

1.      Plaintiff Jesus Chavez Flores ("Chavez"), an immigrant detainee at the Northwest Detention Center ("NWDC") in Tacoma, Washington, seeks declaratory and injunctive relief and compensatory and punitive damages to address Defendants' retaliation against him for exercising his First Amendment right to engage in peaceful protest of state action.

2.      In early February 2018, over 120 immigrant detainees at NWDC engaged in a hunger strike to protest the conditions of their confinement. Detainees sought to call attention to issues including the food they receive and the wage of one dollar per day paid to detainees for

PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 1

**American Civil Liberties Union of
Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

cooking, cleaning, and otherwise maintaining the center.[1]

3.      Mr. Chavez participated in the hunger strike along with the other detainees in his unit, C-3.

4.      Defendants, by and through their employees and agents at NWDC, which Defendants operate and have exclusive control and authority over, accused Mr. Chavez of leading the hunger strike in his unit.

5.      Minutes later, a NWDC guard physically assaulted Mr. Chavez and other detainees who participated in the hunger strike. The guard shoved detainees against the wall, choked one detainee, and punched Mr. Chavez in the eye.

6.      Guards then imprisoned Mr. Chavez in an isolation unit on false disciplinary charges.

7.      Mr. Chavez was locked in the isolation unit for twenty days, where he was permitted only one hour outside in a small "yard" by himself each day. He was allowed to shower only three times per week. He was handcuffed and shackled every time he left the isolation cell. He was required to fill out written requests in English in order to go to the medical clinic or to make phone calls, and received no assistance from anyone, even though he speaks and writes only in Spanish.  After his release from segregation, he was reclassified to a higher security level and moved to a different unit than before.

8.      Mr. Chavez continued to have difficulty opening his injured eye, and could not see properly out of that eye. He was denied appropriate medical care for his injury until he filed suit.

---

[1] Other suits have been filed against GEO to enforce state minimum wage laws on behalf of immigrant detainees at NWDC. *See, e.g., Washington v. GEO Group, Inc.*, No. 3:17-05806, 2017 WL 6034369 (W.D. Wash. Dec. 6, 2017); *cf. Menocal v. GEO Grp., Inc.*, No. 17-1125, 2018 WL 797165 (10th Cir. Feb. 9, 2018) (same challenge in Colorado). These underlying employment issues are not the subject of this Complaint.

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 2

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

9.      As a result of Defendants' actions, Mr. Chavez has suffered serious injury.

## II.      **PARTIES**

10.     Plaintiff Jesus Chavez Flores is an immigrant held in civil detention under the custody of Immigration and Customs Enforcement ("ICE") at NWDC while he awaits adjudication of his immigration case.  Mr. Chavez speaks and reads Spanish and cannot speak or read English.

11.     Defendant ICE is a federal law enforcement agency within the Department of Homeland Security. ICE is responsible for the criminal and civil enforcement of the immigration laws, including the detention, incarceration, and removal of immigrants. ICE discharges its responsibility for incarceration of immigrants by promulgating detention standards for the facilities in which immigrants are held pending removal hearings and contracting with the government entities and private corporations that operate detention facilities, including NWDC. Enforcement and Removal Operations ("ERO"), a division of ICE, manages and oversees the immigration detention system. ICE authorizes the placement of detainees in disciplinary segregation, and did so in Mr. Chavez's case. ICE contracts with the GEO Group, Inc. to handle daily operations for NWDC.

12.     Defendant Thomas D. Homan ("Homan") is the Principal Deputy Assistant Secretary of ICE. Defendant Homan is responsible for the management and control of the agency, and ICE's policies, practices, and procedures, including those relating to the detention of immigrants during their removal procedures. As such, he is the legal custodian of Mr. Chavez.

13.     Defendant Marc J. Moore ("Moore") is the Field Officer Director of the Seattle Field Office of ICE. The Seattle Field Office is responsible for carrying out ICE's immigration

PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 3

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

detention and removal operations in Alaska, Oregon, and Washington State.

14.   Defendant Bryan Wilcox ("Wilcox") is the Deputy Field Office Director of the Seattle Field Office of ICE.

15.   Defendant William Penaloza ("Penaloza") is an Assistant Field Office Director of Detention in the Seattle Field Office of ICE.

16.   Defendant Drew Bostock ("Bostock") is an Assistant Field Office Director of Detention in the Seattle Field Office of ICE.

17.   As Field Office Director, Deputy Field Office Director, and Assistant Field Office Directors, Defendants Moore, Wilcox, Penaloza, and Bostock oversee the Seattle Field Office's functions and the implementation of ICE detention standards at NWDC, and have custody of Mr. Chavez.

18.   In addition to the foregoing ICE agents and officials, unknown named ICE agents and officials are sued herein in their official capacities under fictitious names as "ICE Does 1-10" because their true names, titles, capacities, and/or degree of responsibility for the acts alleged herein are unknown to Plaintiff at this time. When Plaintiff ascertains this information, he will amend this Complaint accordingly. ICE Does 1-10 include, but are not limited to, ICE Officials and Supervisors, ICE Officers, and/or Immigration Enforcement Agents with ICE (collectively, the "ICE Doe Defendants"). The ICE Doe Defendants are legally liable to Plaintiff in some part for the wrongful acts and omissions of which Plaintiff complains herein.

19.   Defendants Homan, Moore, Wilcox, Penaloza, Bostock, and ICE Doe Defendants ("ICE Defendants") are sued only in their official capacities.

20.   Defendant GEO Group, Inc. ("GEO") is a corporation organized under the laws of

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 4

American Civil Liberties Union of Washington Foundation
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

the State of Florida and conducts regular business in the State of Washington, including the operation of NWDC. GEO detains tens of thousands of immigrant detainees in the United States. In 2015, GEO received $326 million in revenue from ICE detention contracts nationwide. GEO owns and operates NWDC. Under the terms of a contract with ICE, GEO provides the facility, management, personnel, and services for 24-hour supervision of immigrant detainees in ICE custody. This contract provides that GEO guards may conduct searches for contraband and may place detainees in segregation units, with notification to and oversight by ICE.

21.     Defendant Lowell Clark ("Clark") is the Warden of NWDC. He operates NWDC for GEO.  Clark is responsible for the supervision of all GEO staff at the facility and is an employee of GEO. He has custody of Mr. Chavez.

22.     Defendant William McHatton ("McHatton") is the Associate Warden of NWDC. He is an employee of GEO.

23.     Defendant Michael Beardsley ("Beardsley") is an Officer at NWDC. He is an employee of GEO.

24.     Defendant Leroy Portillo ("Portillo") is a Captain at NWDC. He is an employee of GEO.

25.     In addition to GEO, unknown named employees of GEO are sued herein in their individual capacities under fictitious names as "GEO Does 1-10" because their true names, capacities, and/or degree of responsibility for the acts alleged herein are unknown to Plaintiff at this time. When Plaintiff ascertains this information, he will amend this Complaint accordingly. GEO Does 1-10 include, but are not limited to, employees of GEO and/or other individuals charged with the care and custody of detainees at NWDC (collectively, the "GEO Doe

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 5

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1  Defendants"). The GEO Doe Defendants are legally liable to Plaintiff in some part for the

2  wrongful acts and omissions of which Plaintiff complains herein.

3        26.     Defendants GEO, Clark, McHatton, Beardsley, Portillo, and GEO Doe

4  Defendants are referred to collectively as "GEO Defendants."

5        27.     Each of the Defendants caused, and is liable for, the unconstitutional and unlawful

6  conduct and resulting injuries, by, among other things, personally participating in said conduct or

7  acting jointly with others who did so; authorizing, acquiescing, or setting in motion policies,

8  plans or actions that led to the unlawful conduct; failing or refusing with deliberate indifference

9  to maintain adequate supervision; and/or ratifying the unlawful conduct taken by employees

10  under their direction and control. Defendants' actions were taken pursuant to a policy, custom, or

11  usage of the contract between ICE and GEO.

12  ### III.     JURISDICTION AND VENUE

13        28.     This action arises under the Constitution of the United States and the

14  Administrative Procedure Act ("APA"), 5 U.S.C. § 500 *et seq*. This action also raises state tort

15  claims under Washington State law.

16        29.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1331

17  (federal question); 5 U.S.C. § 701 *et seq.* (APA); and 28 U.S.C. § 1346 (original jurisdiction).

18  The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702. *See e.g.*

19  *Clinton v. Babbitt*, 180 F.3d 1081, 1087 (9th Cir. 1999).

20        30.     This Court may grant relief pursuant to 28 U.S.C. § 1331 (federal question), 5

21  U.S.C. § 702 and 706 (APA), 28 U.S.C. § 2201-02 (declaratory relief), and Fed. R. Civ. P. 65

22  (injunctive relief).

PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 6

**American Civil Liberties Union of
Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

31.     The Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

32.     Venue is proper in the Western District of Washington under 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred, and continue to occur, in this District.

## IV.     FACTS

**A.     Mr. Chavez and Other Detainees Were Choked, Punched, and Shoved by Guards After Engaging in a Peaceful Hunger Strike.**

33.     On Wednesday, February 7, 2018, some of the detainees at NWDC began a hunger strike to protest the conditions of confinement at the facility.

34.     The next day, on February 8, 2018, after hearing that other units had begun a hunger strike, detainees in Unit C-3 joined the effort. Everyone in the unit participated in the hunger strike, which they began at lunchtime by refusing their meal trays.

35.     A guard demanded that they eat and threatened to put them in a holding cell if they did not.

36.     At the start of the strike, Mr. Chavez talked to another detainee about his reasons for participating in the strike.  Mr. Chavez participated in the strike because of his concerns regarding the quality and quantity of the food received by detainees and the wage of one dollar per day paid to detainees to maintain the facility.

37.     A guard in the unit, Michael Snyder, overheard him talking, told him to "shut up," and instructed him to come to the front of the unit.  Mr. Chavez complied.

38.     When Defendant Portillo entered the unit, he asked who was responsible for the strike. Officer Snyder pointed at Mr. Chavez and said that he was the leader of the hunger strike.

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 7

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

39.     Defendant Portillo tried to take Mr. Chavez and another detainee, Mr. Orozco, who was interpreting for Mr. Chavez, outside of the unit.

40.     The other detainees objected and requested that Defendant Portillo talk with Mr. Chavez and Mr. Orozco inside the unit, explaining that they were all participants in the hunger strike.

41.     Several additional guards entered the unit, including Michael Beardsley, known to be aggressive and abusive with detainees.

42.     Defendant Beardsley began to push and shove detainees near the entrance of the unit.

43.     Defendant Beardsley pushed Mr. Chavez.

44.     Defendant Beardsley also aggressively pushed another detainee, whose name is unknown, against Benito Vasquez Sanchez ("Vasquez"), a detainee standing near the door. He pushed them so hard that Mr. Vasquez hit a phone station, injuring his right side.

45.     Defendant Beardsley then grabbed detainee Jose Mesino Garcia ("Mesino") by the neck. He choked Mr. Mesino three times in a row.

46.     After Defendant Beardsley let go of Mr. Mesino, he punched Mr. Chavez with a closed fist in the left eye. Upon impact, Mr. Chavez bent over and tried to cover his eye with his hands.

47.     Such use of force is specifically prohibited under ICE guidelines, which specify that choke holds, carotid control holds, and other neck restraints are specifically prohibited unless deadly force would be authorized, and that using force against a detainee offering no resistance is generally prohibited, unless both necessary and reasonable in the circumstances.

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 8

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

48.     The guards told Mr. Chavez and Mr. Orozco to "get out" of the unit. Mr. Orozco was in handcuffs. Mr. Chavez was afraid to exit the unit because Defendant Beardsley—who had just punched him—was nearby. Mr. Chavez agreed to move only after Defendant Beardsley left the area.

49.     Mr. Chavez was taken to the medical unit, where he was examined by a doctor, but only given over-the-counter pain medication. No other medical treatment was offered, even though he was in extreme pain.

50.     After the exam, Defendant Portillo spoke to Mr. Chavez and Mr. Orozco. Defendant Portillo accused Chavez of being the leader of the hunger strike. Mr. Chavez explained that he was not the leader of the strike and that everyone in the unit had decided to participate together.

51.     Defendant Portillo and other guards then held a meeting with the other detainees in Unit C-3. Defendant Portillo told the detainees that if ICE found out about what had happened, there would be "more problems." Defendant Portillo told the detainees that there was no need to participate in a hunger strike because they could fill out "kites" to file their complaints. The detainees responded that they had used kites in the past, but did not receive responses.

52.     Some detainees, including Mr. Chavez, continued to participate in the hunger strike after the assaults.

53.     Other detainees did not continue the strike because the guards began to write down the names of those who refused food, and the detainees feared retaliation.

54.     One guard told detainees that if they did not eat, it would negatively impact and prejudice their immigration cases.

PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 9

**American Civil Liberties Union of**
**Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

55. The next morning, February 9, 2018, Mr. Chavez went to the medical unit again because he was unable to open his eye. He was given only ointment and eye drops.

56. NWDC staff informed ICE's Seattle Field Office of the events of February 8, 2018. The contract between ICE and GEO requires GEO to "immediately report" to ICE officials incidents including "food boycotts, work strikes," "staff uses of force including lethal and less-lethal force," "assaults on . . . detainees resulting in injuries that require medical attention," and "full or partial lock-down of the facility." Exh. N (Excerpts of ICE and GEO Contract Re: NWDC).

57. ICE officials review all events of use of force as part of an After Action Review Team, which must include the participation of an ICE representative. The After Action Report must be submitted to ICE within 30 days of an incident involving use of force. GEO must make video footage of all incidents involving use of force available for ICE review. Exh. N.

58. ICE Defendants had constructive knowledge that Mr. Chavez participated in the hunger strike and assumed that he led the strike in his unit. On February 12, 2018, ICE Defendant Bostock and GEO Defendants Clark and Portillo participated in a Use of Force After Action Review of the assault of Mr. Chavez. They noted that Mr. Chavez had "instructed detainees to refuse their lunch trays," and concluded that Defendant Beardsley's use of force was "appropriate" and "carried out in a professional manner" because Mr. Chavez's "own actions created the opportunity for his eye to accidentally be poked." ECF No. 25, Decl. of Joan Mell, Exh. A (Use of Force—After Action Review).

**B.   Mr. Chavez Was Placed into Isolation on False Disciplinary Charges, Without Proper Procedural Protections.**

59. On Saturday, February 10, 2018, Mr. Chavez again returned to the medical unit

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 10

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

because his vision was blurry and it was still difficult for him to open his eye.

60.    He was examined by a different doctor than the day of his injury. This new doctor recommended that he go to an offsite hospital for an eye examination.

61.    However, the initial examining doctor denied this offsite hospital visit. Mr. Chavez returned to his unit.

62.    When Mr. Chavez returned to his unit, he sat with some other detainees, including Mr. Vasquez. A guard approached them and spoke in English to another detainee. The guard pointed to a box (locker) in the unit and asked whose it was. Mr. Vasquez responded that he did not know.

63.    Approximately thirty minutes later, guards left copies of Evidence/Search Reports on each detainee's bed. The reports described any confiscated property taken from detainees after an inspection for contraband. Mr. Chavez's report, completed that day by guards at 2:45 p.m., indicated that he had nothing in his property that had been confiscated.

64.    At 3:00 p.m., the guards changed shifts. A guard instructed Mr. Chavez to go to the doctor. Mr. Chavez went to the medical unit again, but was told that he did not need to be there and to return the following week. Mr. Chavez returned to Unit C-3 and informed the guard that he had been told not to go to the medical unit until the following week.

65.    The guard told him to go back to the medical unit.

66.    Guards then took Mr. Chavez to a small room, which was not the medical unit. A guard in the room asked him in Spanish, "when is the party going to be?" Mr. Chavez responded, "what party?"

67.    The guard replied, "the party that you are preparing for after the strike, because

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 11

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1  regularly, after a hunger strike, they celebrate with wine." Mr. Chavez responded that he did not

2  know what the guard was talking about.

3       68.    The guard showed Mr. Chavez a photo of a bag with apples and water in it,

4  apparently used to make alcohol. He informed Mr. Chavez that the bag had been found in his

5  property.

6       69.    The guard told Mr. Chavez that he was being put into segregation.

7       70.    Mr. Chavez informed the guard that the bag was not his. He asked the guard to

8  review the cameras, which provide video surveillance of the residential unit.

9       71.    The guard gave Mr. Chavez an Administrative Detention Order, which stated that

10  he was being placed into the Restrictive Housing Unit pending a charge for adulterating food and

11  drink. The order was issued at 4:20 p.m.

12       72.    The guard also gave Mr. Chavez a Notice of Disciplinary Panel Hearing, which

13  stated that he was being referred to the Unit Disciplinary Committee ("UDC") two days later, on

14  February 12, 2018 at 11:00 a.m.

15       73.    Detainees who are placed in administrative segregation must receive an order in a

16  language the detainee can understand. Under ICE guidelines, all written materials provided to

17  detainees must generally be translated into Spanish.

18       74.    Detainees subject to discipline in ICE detention must first receive an Incident

19  Report. An Incident Report may be forwarded to the UDC, which conducts hearings and may

20  impose sanctions on detainees. Detainees in UDC proceedings have the right to a hearing within

21  24 hours after the conclusion of an investigation and to attend the entire hearing unless they

22  waive the right to appear. Detainees may present statements and evidence, including witness

23

24  PLAINTIFF'S SECOND AMENDED COMPLAINT,
   NO.  3:18-cv-05139-BSH-DWC - 12

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

testimony on their behalf, and appeal the committee's determination through a grievance process. The UDC must serve a copy of its decision to the detainee.

75.     The Incident Report, Administrative Detention Order, and Notice of Disciplinary Panel Hearing issued to Mr. Chavez were all only in English, not Spanish.

76.     The guard instructed Mr. Chavez that he would have a chance to talk with a judge from Defendant GEO who would decide if he should continue to be in segregation.

77.     Mr. Chavez again asked the guard to check the cameras.

78.     Guards handcuffed Mr. Chavez and placed him in segregation.

**C.     Mr. Chavez Was Placed in Disciplinary Segregation Without Due Process After the Tacoma Police Department Investigated NWDC Guards.**

79.     Mr. Chavez was placed in segregation on February 10, 2018.

80.     From February 10, 2018 to March 1, 2018, Mr. Chavez spent 23 hours a day in isolation, in a cell that only had a bed, a toilet, shelf, table, chair, and a sink.

81.     Mr. Chavez was only allowed to shower three times a week.

82.     Mr. Chavez was prohibited from participating in any programming activities.

83.     After his initial placement in segregation on February 10, 2018, guards informed Mr. Chavez that he would have a disciplinary hearing on Monday, February 12, 2018 regarding his status in segregation.

84.     No one came to talk to Mr. Chavez on February 12, 2018. He did not waive the right to appear at the hearing.

85.     On Wednesday, February 14, 2018, a police officer from the Tacoma Police Department interviewed Mr. Chavez at NWDC. His wife had called the Police Department to report the assault of Mr. Chavez by Defendant Beardsley. The police officer asked Mr. Chavez

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 13

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

about what had happened that day. The police officer did not speak Spanish, and an NWDC guard, employed by GEO, served as an interpreter. The police officer also took a statement from NWDC guards regarding the incident.

86.     A few hours after the police officer's visit, Mr. Chavez was informed that he would be placed in disciplinary segregation for 20 days.

87.     Disciplinary segregation is a punitive form of solitary confinement, and is the most restrictive form of segregation in an ICE facility. A detainee may be placed in disciplinary segregation only by order of the Institution Disciplinary Panel ("IDP"), which conducts formal hearings on Incident Reports referred by the UDC. Detainees must receive a copy of the UDC decision, written notification of charges, and a hearing before the IDP. Detainees have the right to attend the entire IDP hearing, present statements and evidence, and appeal the committee's determination. A detainee may only be placed in disciplinary segregation after a hearing where the detainee has been found to have committed a prohibited act and only when alternative dispositions are not deemed adequate to regulate the detainee's behavior. The chair of the IDP must complete a written order, which must be immediately provided to the detainee in a language the detainee can understand. All written materials provided to detainees must generally be translated into Spanish.

88.     Mr. Chavez was not provided with a copy of the UDC decision or given notice, formal or informal, of the IDP hearing. Because he did not know the hearing was taking place, and because he was in segregation, he did not attend the hearing.

89.     After the IDP hearing on February 14, 2018, Mr. Chavez was given a copy of an IDP Report. The report was issued in English, not Spanish.

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 14

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

90.     The NWDC's IDP Report template requires approval by a Hearing Supervisor and an ICE Official. Both an ICE official and a NWDC lieutenant signed approval of the IDP Report that authorized Mr. Chavez's placement in disciplinary segregation on February 14, 2018. Dkt. No. 2-2, Cho Decl. Ex. F (Institution Disciplinary Panel Report).

91.     The IDP Report states that Mr. Chavez had been found guilty of violating Code Section 210: Adulteration of Food or Drink. The report indicates that no documentary evidence other than the incident report was considered. The report indicates that Mr. Chavez had requested video to be reviewed, but states that he "could not provide any potential date or time when somebody might have put items in box." At no time did anyone ask Mr. Chavez about the date and time related to the video review he requested on February 10, 2018, the day of the incident.

92.     The IDP Report states that Mr. Chavez would be placed into disciplinary segregation for 20 days, with time served. He was not scheduled to be released from segregation until March 1, 2018.

93.     ICE's Seattle Field Office maintains close oversight of the use of segregation at NWDC. Under ICE's own policies, the Performance Based National Detention Standards (2011) ("PBNDS"), which govern the facility, ICE must be immediately notified and provided with a copy of all administrative segregation orders. PBNDS §§ 2.12(II)(3); 2.12(V)(A)(2)(f). ICE's Field Office must be consulted when developing procedures governing the management of administrative segregation units. PBNDS § 2.12(V)(A). NWDC's facility administrator must coordinate with ICE's Field Office Director in considering whether less restrictive housing or custodial options are available for detainees in segregation. PBNDS § 2.12(V)(C).

94.     NWDC's facility administrator must notify ICE in writing whenever an ICE

**American Civil Liberties Union of
Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1    detainee has been held continuously in segregation for 14 days; after a total of 30 days of

2    disciplinary segregation; or immediately if a detainee was placed in administrative segregation

3    due to participation in a hunger strike.  PBNDS § 2.12(V)(C).

4         95.    During Mr. Chavez's segregation, guards handcuffed both Mr. Chavez's hands

5    and feet when leaving the isolation cell, which they did not do prior to February 14, 2018. Mr.

6    Chavez was the only detainee in the unit who had to follow that protocol.

7         96.    On Thursday, February 15, 2018, Defendant Beardsley—the guard who assaulted

8    Mr. Chavez—was assigned to bring him out of the isolation cell. Mr. Chavez did not want to

9    come out because he was scared of the guard.

10        97.    Mr. Chavez was required to fill out a form to request phone calls and medical

11   attention. The form provided to him was only in English and he had trouble filling it out because

12   he does not speak English and because he could not see properly out of his injured eye. He was

13   told that officers would review his requests and provide a response within two days.

14        98.    The guards did not provide him with assistance in filling out the forms.

15        99.    Even though he filled out a request to call his wife on February 16, 2018, Mr.

16   Chavez did not receive a response from officers until February 21, 2018.

17        100.    Mr. Chavez is no longer participating in the hunger strike because he fears

18   physical harm and further retribution and does not want to get into further trouble.

19        101.    On March 1, 2018, Mr. Chavez was released from segregation. He was placed

20   into a new unit with a higher security classification.

21        102.    Mr. Chavez has suffered serious irreparable injury as a direct result of

22   Defendant's actions.  He suffered irreparable harm during his unlawful solitary confinement. He

23

24   PLAINTIFF'S SECOND AMENDED COMPLAINT,
     NO.  3:18-cv-05139-BSH-DWC - 16

**American Civil Liberties Union of
Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1  has been placed in a higher security level of detention after his release from solitary confinement,

2  and fears further retaliation if he exercises his right to free speech.

3      103.    Mr. Chavez also continues to suffer injury to his eye. He was permitted to see a

4  doctor outside of the detention facility only after he filed suit. Mr. Chavez has suffered these

5  injuries as a result of his lawful and peaceful participation in classic First Amendment activity: a

6  hunger strike to protest conditions of confinement.

7      104.    Defendants have engaged in a pattern and practice of assault and battery against

8  detainees at NWDC. Defendants have also engaged in a pattern and practice of placing detainees

9  who have participated in hunger strikes in solitary confinement in retaliation for exercising their

10  First Amendment rights.

11  ## V.    FIRST CAUSE OF ACTION: VIOLATION OF FREEDOM OF EXPRESSION

12  **(Federal Constitutional Claim) (5 U.S.C. §§ 702, 706) (Against All**

13  **Defendants)**

14      105.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-

15  104 above as if fully set forth herein.

16      106.    The First Amendment guarantees Plaintiff the right to freedom of speech and

17  freedom of expression. Plaintiff exercised his right to these protected freedoms by engaging in a

18  hunger strike to express his views about the conditions of confinement at NWDC.

19      107.    Defendants violated Plaintiff's right to freedom of speech and freedom of

20  expression by assaulting him, placing him in solitary confinement, and changing his security

21  level in retaliation for his free speech activities.

22      108.    Defendants' actions chilled Plaintiff's right to freedom of speech and expression.

23      109.    Defendants' actions did not reasonably advance a legitimate institutional goal.

24  PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 17

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

110.     Plaintiff suffered, and continues to suffer, irreparable injuries as a result of Defendants' policies, practices, and omissions and is entitled to injunctive relief to avoid further injury.

## VI.     SECOND CAUSE OF ACTION: ASSAULT AND BATTERY

**(Washington State Tort Claim) (Against Defendants GEO, Clark, McHatton, Portillo, Beardsley, and GEO Does 1-10)**

111.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 - 110 above as if fully set forth herein.

112.     Defendants are responsible for the acts and occurrences alleged and Plaintiff's damages were proximately caused by these Defendants.

113.     On February 8, 2018, Defendant Beardsley struck Plaintiff in the eye.

114.     Defendant Beardsley intended to make contact with Plaintiff and struck him without provocation or just cause.

115.     At no time did Plaintiff consent to the acts of the Defendants.

116.     Defendants Beardsley, Clark, McHatton, Portillo, and GEO Does 1-10 acted in the scope of their employment for GEO when they committed these acts.

## VII.     THIRD CAUSE OF ACTION: FALSE IMPRISONMENT

**(Washington State Tort Claim) (Against Defendants GEO, Clark, McHatton, Portillo, GEO Does 1-10)**

117.     Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-116 above as if fully set forth herein.

118.     On February 10, 2018, Defendants placed Plaintiff in solitary confinement

PLAINTIFF'S SECOND AMENDED COMPLAINT, NO.  3:18-cv-05139-BSH-DWC - 18

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1    without proper due process and on the basis of false charges in retaliation for his exercise of First

2    Amendment protected speech.

3        119.    Plaintiff did not commit the offense for which he was placed in solitary

4    confinement; nor did Defendants follow required procedures in placing him in solitary

5    confinement.

6        120.    Defendants acted with deliberate malice and disregard of Plaintiff in retaliation

7    for his exercise of his First Amendment rights.

8        121.    Defendants placed Plaintiff in solitary confinement without proper authority,

9    constituting a violation of state tort law of false imprisonment.

10       122.    Plaintiff suffered harm, including, but not limited to, loss of liberty and severe

11   emotional distress.

12       123.    Defendants Clark, McHatton, Portillo, Beardsley, and GEO Does 1-10 acted in

13   the scope of their employment for GEO when they committed these acts.

## VIII.   FOURTH CAUSE OF ACTION: NEGLIGENCE

### (Washington State Tort Claim) (Against Defendants GEO, Clark, McHatton, Portillo, Beardsley, and GEO Does 1-10)

16       124.    Plaintiff repeats and realleges each of the allegations contained in paragraphs 1-

18   123 above as if fully set forth herein.

19       125.    Defendants breached their duty of reasonable care by negligently acting in such a

20   way that resulted in Plaintiff's injury, which they knew or should have known would pose a

21   substantial risk of harm to Plaintiff.

22       126.    Defendants breached their duty of reasonable care by negligently acting or

23   omitting to act in such a way that resulted in Plaintiff's wrongful detention in solitary

24   PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 19

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

confinement, which they knew or should have known posed a substantial risk of harm to Plaintiff.

127.   Defendants breached their duty of reasonable care by failing to timely provide adequate medical care to Plaintiff, which they knew or should have known would pose a substantial risk of harm to Plaintiff.

128.   Plaintiff suffered injury as a result of Defendants' negligence.

129.   Defendants Clark, McHatton, Portillo, Beardsley, and GEO Does 1-10 acted in the scope of their employment for GEO when they committed these acts.

## IX.   **PRAYER FOR RELIEF**

WHEREFORE Plaintiff requests judgment be entered against the Defendants as follows:

1.   A permanent injunction prohibiting Defendants, their subordinates, agents, employees, and all others acting in concert with them from retaliating against Plaintiff, including by assault, incarceration of Plaintiff in segregation, solitary confinement, or isolation, or placement in a higher security level based upon his engagement in free speech activities protesting conditions of confinement at NWDC;

2.   Declaratory judgment declaring that Defendants have violated Plaintiff's First Amendment right to freedom of speech and expression by subjecting him to assault, incarceration in segregation, solitary confinement, and/or isolation, and placement in a higher security level, in retaliation for his participation in a hunger strike;

3.   General damages against GEO Defendants, jointly and severally, in an amount to be proven at trial;

4.   Special damages against GEO Defendants, jointly and severally, in an amount to

PLAINTIFF'S SECOND AMENDED COMPLAINT,
NO.  3:18-cv-05139-BSH-DWC - 20

**American Civil Liberties Union of Washington Foundation**
901 5th Ave, Suite 630
Seattle, WA 98164
206-624-2184

1  be proven at trial;

2      5.      Punitive damages against GEO Defendants, jointly and severally, in an amount to

3  be proven at trial;

4      6.      Leave to amend this complaint as needed and as required;

5      7.      Costs and reasonable attorneys' fees in an amount to be proven at trial;

6      8.      Interest on amounts authorized by law; and

7      9.      Grant such further relief as the Court deems just and proper.

8      RESPECTFULLY SUBMITTED this June 20, 2018.

9                          AMERICAN CIVIL LIBERTIES UNION OF
                           WASHINGTON FOUNDATION
10
                     By:      /s/ Emily Chiang_____
11                            Emily Chiang, WSBA No. 50517
                              echiang@aclu-wa.org
12                            Eunice Hyunhye Cho,* GA Bar No. 632669
                              echo@aclu-wa.org
13                            Antoinette M. Davis, WSBA # 29821
                              tdavis@aclu-wa.org
14                            901 Fifth Avenue, Suite 630
                              Seattle, WA 98164
15                            Tel: (206) 624-2184

16                         McNAUL EBEL NAWROT & HELGREN, PLLC

17                            Daniel M. Weiskopf, WSBA #44941
                              Theresa Demonte, WSBA#43994
18                            600 University Street, Suite 2700
                              Seattle, Washington 98101
19                            Tel:    (206) 467-1816
                              Fax:    (206) 624-5128
20                            Email: dweiskopf@mcnaul.com
                                     tdemonte@mcnaul.com
21
                              *Admitted pro hac vice
22
                           *Attorneys for Plaintiff Jesus Chavez Flores*
23

24  PLAINTIFF'S SECOND AMENDED COMPLAINT,
    NO.  3:18-cv-05139-BSH-DWC - 21



Exhibit N

THE HONORABLE ROBERT J. BRYAN

**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA**

STATE OF WASHINGTON,

                      Plaintiff,

v.

THE GEO GROUP, INC.,

                      Defendant.

Case No.: 3:17-cv-05806-RJB

DECLARATION OF JOAN K. MELL ATTACHING GEO-ICE CONTRACT WITH LIMITED TRADE SECRET REDACTIONS

     I, Joan K. Mell, make the following statement under oath subject to the penalty of perjury pursuant to the laws of the United States and the State of Washington:

1. I am the attorney for The GEO Group, Inc. in the above-captioned matter.  I am over the age of eighteen (18), and I am competent to testify in this matter.

2. Pursuant to the Court's Order requesting a full copy of the contract between GEO and the federal government, Dkt. 14, attached is a true and correct copy of the following exhibit:

3. Exhibit A: The contract for the Northwest Detention Center between The GEO Group, Inc. and The Department of Homeland Security, Immigration and Customs Enforcement with redactions for trade secret pricing information and bank routing identifiers.

///

DECLARATION OF JOAN K. MELL
ATTACHING GEO-ICE CONTRACT W/LIMITED TRADE SECRET REDACTIONS
3:17-cv-05806-RJB                1 of 3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

Dated this 17th day of November, 2017 at Fircrest, WA.

III Branches Law, PLLC

_____
Joan K. Mell, WSBA #21319
Attorney for The Geo Group, Inc.

DECLARATION OF JOAN K. MELL
ATTACHING GEO-ICE CONTRACT W/LIMITED TRADE SECRET REDACTIONS
3:17-cv-05806-RJB                    2 of 3

III BRANCHES LAW, PLLC
Joan K. Mell
1019 Regents Blvd. Ste. 204
Fircrest, WA 98466
253-566-2510 ph

HSCEDM-15-D-00015

procedures, and instructions prior to being initially assigned to that post. The Contractor shall retain Officer Certifications and make them available to the COR upon request.

**L. Deviation from Prescribed Schedule Assignments**
The Contractor is authorized to deviate from the scheduled assignment when unusual conditions or circumstances so demand, and if prior approval is received from the COR. All deviations shall be recorded in the daily logbook. When the COR is not available, the Contractor shall notify ICE-designated employee immediately or as soon as is practically possible.

**M. Use of Force Policy**
ICE restricts the use of physical force by Officers to instances of justifiable self-protection, protection of others, and protection of property and prevention of escapes. Physical force may only be used to the degree necessary to safeguard the well-being of the detainee(s) and others in the immediate area. The following policies pertain to use of force:

1. In no case shall physical force be used as punishment or discipline.

2. The Contractor shall adhere to ICE Policy Statement on the use of deadly and non-deadly force to include the use of intermediate and deadly weapons.

3. The respective Officer shall immediately report all instances of use of physical force to his or her immediate supervisor. Prior to leaving his or her shift, the Supervisory Detention Officer shall prepare a written report and submit it to the Warden/Facility Director, who shall review, approve, and provide the report to the COR or ICE-designated employee within 24 hours of the incident.

4. The physical force report shall include:

    a. An accounting of the events leading to the use of force.

    b. A precise description of the incident to include date, time, place, type of force used, and reasons for employing force.

    c. A description of the person (Officers or detainees) who suffered described injuries, if any, and the treatment given.

    d. A list of all participants and witnesses (Contractors, detainees, and ICE personnel) to the incident.

5. The calculated use of force must be in accordance with the ICE PBNDS and requires, at a minimum, the following:

    a. The formulation of an After Action Review Team, which must include the participation of the COR or ICE-designated employee.

    b. An After Action Report submitted to the COR within 30 days of the incident, with corrective actions noted, if applicable.

    c. Video footage of the incident must be made available for ICE review.

**N. Use of Restraints Policy**
The Contractor shall comply with ICE written policy and procedures governing the use of restraint equipment. Restraints shall never be applied as punishment for more time than is necessary. Restraints shall be used only as a precaution against escape during transfer to prevent detainee self-injury, injury to others, property damage, or for medical reasons under direction of the Health Authority. Restraints consist of handcuffs, waist restraints, and leg restraints. When directed by the COR or ICE-designated employee, the Officer may use disposable nylon straps in lieu of handcuffs or leg restraints in emergencies, mass arrest situations, or if a detainee's wrists or ankles are too large for conventional restraints. ICE prohibits the Contractor from using all other restraint devices.

**O. Intelligence Information**
The Contractor shall notify the COR or ICE-designated employee immediately on issues which could impact the safety, security, and the orderly operation of the facility.

## QUALITY ASSURANCE SURVEILLANCE PLAN

### 1. INTRODUCTION

ICE's Quality Assurance Surveillance Plan (QASP) is based on the premise that the Service Provider, and not the Government, is responsible for the day-to-day operation of the Facility and all the management and quality control actions required to meet the terms of the Agreement. The role of the Government in quality assurance is to ensure performance standards are achieved and maintained. The Service Provider shall develop a comprehensive program of inspections and monitoring actions and document its approach in a Quality Control Plan (QCP). The Service Provider's QCP, upon approval by the Government, will be made a part of the resultant Agreement.

This QASP is designed to provide an effective surveillance method to monitor the Service Provider's performance relative to the requirements listed in the Agreement. The QASP illustrates the systematic method the Government (or its designated representative) will use to evaluate the services the Service Provider is required to furnish.

This QASP is based on the premise the Government will validate that the Service Provider is complying with ERO-mandated quality standards in operating and maintaining detention facilities. Performance standards address all facets of detainee handling, including safety, health, legal rights, facility and records management, etc. Good management by the Service Provider and use of an approved QCP will ensure that the Facility is operating within acceptable quality levels.

### 2. DEFINITIONS

**Performance Requirements Summary (Attachment A):** The Performance Requirements Summary (PRS) communicates what the Government intends to qualitatively inspect. The PRS is based on the American Correctional Association (ACA) Standards for Adult Local Detention Facilities (ALDF) and ICE 2011 Performance Based National Detention Standards (PBNDS). The PRS identifies performance standards grouped into nine functional areas, and quality levels essential for successful performance of each requirement. The PRS is used by ICE when conducting quality assurance surveillance to guide them through the inspection and review processes.

**Functional Area:** A logical grouping of performance standards.

**Contracting Officer's Technical Representative (COTR):** The COTR interacts with the Service Provider to inspect and accept services/work performed in accordance with the technical standards prescribed in the Agreement. The Contracting Officer issues a written memorandum that appoints the COTR. Other individuals may be designated to assist in the inspection and quality assurance surveillance activities.

**Performance Standards:** The performance standards are established in the ERO ICE 2011 PBNDS at http://www.ice.gov/detention-standards/2011 as well as the ACA standards for ALDF. Other standards may also be defined in the Agreement.

1

explanation.  This process should take no more than one week.  The CDR shall not be used as a substitute for quality control by the Service Provider.

(c) The COTR, in addition to any other designated ICE official, shall be notified immediately in the event of all emergencies.  Emergencies include, but are not limited to the following: activation of disturbance control team(s); disturbances (including gang activities, group demonstrations, food boycotts, work strikes, work-place violence, civil disturbances, or protests); staff use of force including use of lethal and less-lethal force (includes detainees in restraints more than eight hours); assaults on staff or detainees resulting in injuries requiring medical attention (does not include routine medical evaluation after the incident); fights resulting in injuries requiring medical attention; fires; full or partial lock down of the Facility; escape; weapons discharge; suicide attempts; deaths; declared or non-declared hunger strikes; adverse incidents that attract unusual interest or significant publicity; adverse weather (e.g., hurricanes, floods, ice or snow storms, heat waves, tornadoes); fence damage; power outages; bomb threats; significant environmental problems that impact the Facility operations; transportation accidents resulting in injuries, death or property damage; and sexual assaults.  Note that in an emergency situation, a CDR may not be issued until an investigation has been completed.

(d)  If the COTR concludes that the deficient or at-risk performance warrants a withholding or deduction, the COTR will include the CDR in its monthly report, with a copy to the Contracting Officer.  The CDR will be accompanied by the COTR's investigation report and written recommendation for any withholding.  The Contracting Officer will consider the COTR's recommendation and forward the CDR along with any relevant supporting information to the Service Provider in order to confirm or further discuss the prospective cure, including the Government's proposed course of action.  As described in section 7 above, portions of the monthly invoice amount may be withheld until such time as the corrective action is completed, *or* a deduction may be taken.

(e)  Following receipt of the Service Provider's notification that the correction has been made, the COTR may re-inspect the Facility.  Based upon the COTR's findings, he or she will recommend that the Contracting Officer continue to withhold a proportionate share of the payment until the correction is made, or accept the correction as final and release the full amount withheld for that issue.

(f)  If funds have been withheld and either the Government or the Service Provider terminates the Agreement, those funds will not be released.  The Service Provider may only receive withheld payments upon successful correction of an instance of non-compliance.  Further, the Service Provider is not relieved of full performance of the required services hereunder; the Agreement may be terminated upon adequate notice from the Government based upon any one instance, or failure to remedy deficient performance, even if a deduction was previously taken for any inadequate performance.

(g)  The COTR will maintain a record of all open and resolved CDRs.

Attachment B

USAO_000236

1

## DECLARATION OF SERVICE

2

On June 20, 2018, I caused to be served a true and correct copy of the foregoing

3

document upon counsel of record, at the address stated below, via the method of service

indicated:

4

5   Antoinette Marie Davis              ☐   Via Messenger
    Eunice Cho                          ☐   Via U.S. Mail
    Emily Chiang                        ☐   Via Overnight Delivery
6   ACLU of Washington                  ☐   Via Facsimile
    901 Fifth Ave., Suite 630           ☑   Via E-mail
7   Seattle, WA 98164
    Email: tdavis@aclu-wa.org
8          echo@ aclu-wa.org
           echiang@aclu-wa.org
9   *Attorneys for Plaintiff*

10  Sarah K. Morehead
    US Attorney's Office (SEA)          ☐   Via Messenger
11  700 Stewart St., Suite 5220        ☐   Via U.S. Mail
    Seattle, WA 98101-1271             ☐   Via Overnight Delivery
12  Email: sarah.morehead@usdoj.gov    ☐   Via Facsimile
    *Attorney for United States Immigration and*   ☑   Via E-mail
13  *Customs Enforcement, Thomas D. Homan,*
    *Bryan Wilcox and William Penaloza*

14

15  Joan K. Mell
    III Branches Law PLLC              ☐   Via Messenger
16  1019 Regents Blvd., Suite 204      ☐   Via U.S. Mail
    Fircrest, WA 98466                 ☐   Via Overnight Delivery
    Email: joan@3brancheslaw.com       ☐   Via Facsimile
17  *Attorney for The GEO Group, Inc. and Lowell*   ☑   Via E-mail
    *Clark*

18

I declare under penalty of perjury under the laws of the United States of America and the

19

State of Washington that the foregoing is true and correct.

20

DATED this 20th day of June, 2018, at Seattle, Washington.

21

22                                      s/ I'sha Willis
                                        I'sha Willis, *Legal Assistant*

23

24  PLAINTIFF'S SECOND AMENDED COMPLAINT,
    NO.  3:18-cv-05139-BSH-DWC - 22